# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:17-CV-00670-GCM

| | |
|---|---|
| DANIEL PARKS<br>CITIES4LIFE, INC.<br>PATRICK COURTNEY,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHARLOTTE, ET AL,<br><br>Defendants. | **ORDER** |

**THIS MATTER COMES** before this Court on Plaintiffs' collective Motion in Limine and Motion to Strike. (Doc. No. 23). The parties have fully briefed the issue and the matter is now ripe for disposition.

## I. BACKGROUND

Plaintiffs Cities4Life, Inc., Daniel Parks, and Patrick Courtney (collectively, "Plaintiffs") brought this civil rights action against: the City of Charlotte; Marcus D. Jones in his official capacity as City Manager of Charlotte ("Jones"); the City of Charlotte Department of Housing and Neighborhood Services ("HNS"); the City of Charlotte Division of Code Enforcement ("DCE"); Ben Krise, individually and in his official capacity as City of Charlotte Code Enforcement Division Manager ("Krise"); Mandy Edwards, individually and in her official capacity as a City of Charlotte Code Enforcement Inspector ("Edwards"); Mark Fowler, individually and in his official capacity as a City of Charlotte Code Enforcement Inspector ("Fowler"); Kimberly Sauer, individually and in her official capacity as a City of Charlotte

1

N&BS Area Supervisor ("Sauer"); and Jane Does 1–5 and John Doe 1, individually and in their official capacities as City of Charlotte employees ("Does") (collectively, "Defendants").

Plaintiff Cities4Life, Inc. ("Cities4Life") is a "faith-based organization that seeks to engage, strengthen, and support local churches and Christians to proclaim, protect, and provide life for unborn babies in each city across the United States where abortion exists." (Compl., ¶ 17). Plaintiff Daniel Parks ("Parks") is the Executive Director of Cities4Life, and Plaintiff Patrick Courtney ("Courtney") is a Missionary for Help Pregnancy Center in Monroe, North Carolina. (Compl., ¶¶ 20, 21).

Cities4Life regularly assembles volunteers and counselors outside of abortion facilities in order to "preach[] the Gospel and speak[] the Truth" to women contemplating an abortion. (Compl., ¶¶ 48–49). Specifically, Cities4Life volunteers hand out information to women going into abortion clinics about "the alternatives to abortion and the means by which they can obtain tangible help in their difficult situation" and pray for "specific immediate needs they encounter in front of abortion centers." (Compl., ¶ 50). As a part of this work, Cities4Life employs the use of signs and placards that are large enough to be seen by individuals entering abortion facilities. (Compl., ¶ 51).

The Charlotte City Code regulates signs within public rights-of-way and on public property. Specifically, the Code provides, in relevant part:

> (a) It shall be unlawful for any person to attach, place, paint, write, stamp or paste any sign within 11 feet of the edge of any pavement of any roadway or alley.
> (b) It shall be unlawful for any person to attach, place, paint, write, stamp or paste any sign within any public rights-of-way.
> (c) It shall be unlawful for any person to attach, place, paint, write, stamp or paste any sign upon any post, pole, tree, tree stake or guard, shrub, or fire hydrant.
> (d)  It shall be unlawful for any person to attach, place, paint, write, stamp or paste any sign upon anything else within 11 feet of the edge of the public rights-of-way, upon any bridge or overpass within the city limits, or upon other public property including, but not limited to, traffic medians.

(e) *Exceptions*. This section shall not apply to the following signs:
1. Signs regulating traffic.
2. Signs required to be posted by law.
3. Warning signs and no trespassing signs.
4. Signs indicating bus stops, taxi stands and similar transportation facilities.
5. Signs not exceeding four square feet in area giving information concerning the location or use of accessory off-street parking facilities or loading and unloading facilities.
6. Signs established by governmental agencies.
7. Signs permitted by the state board of transportation along state-mandated streets. Proof of permission must be shown upon request.
8. Nothing in this section shall apply to the painting of house numbers on curbs done with the prior approval of the engineering department.
9. Nothing in this section shall apply to the installation of a plaque, plate, statue, or monument on public property with the approval of the city council.
10. Nothing in this section shall apply to the removal of an illegally placed sign which is in violation of this section.
11. A violation of any provision of this section shall not constitute an infraction or misdemeanor punishable under G.S. 14-4.

(f) *Responsible person*. The responsible person for any signs in violation of subsection (a) through (d) is defined as follows:
1. In the case of a sign advertising a service, product, dwelling, or event, the responsible person shall be deemed the person hosting or organizing the event or the person attaching, placing, painting, writing, stamping, or pasting any sign. Violation of this section shall subject the responsible person to a civil penalty of $100.00 per sign.

Charlotte, N.C., Code § 10-141 (June 6, 2018).[1]

On June 29, 2017, Parks led a team of Cities4Life volunteers to hand out information on public property near an abortion clinic called A Preferred Women's Health Center of Charlotte ("Preferred Women's Health"). Defendants Krise and Fowler arrived and confiscated and

---

[1] At the time the Complaint was filed, this provision was listed as § 10-212. *See* Charlotte, N.C., Code § 10-212 (August 31, 2016), available at: https://library.municode.com/nc/charlotte/codes/code_of_ordinances/264937?nodeId=PTIICOOR_CH10HESA_ARTIISOWASE_DIV6MAPRLICO_S10-212SIWIPURI-WPUPR. Thus, the Complaint and briefs of both parties refer to the code provision as § 10-212. However, the city code was amended, and the provision is now listed as § 10-141. It appears to the Court that the language supporting the suit remains unchanged. Further, neither party has argued that the amendments moot the dispute. Accordingly, the Court will refer to the provision at issue as § 10-141 to reflect the code provision as it currently exists.

subsequently destroyed a canopy belonging to Cities4Life. The canopy was not blocking any right of way, and it was not affixed permanently or semi-permanently.

On July 5, 2017, Parks and Cities4Life again engaged in their activities near Preferred Women's Health and three officials from the DCE arrived and began issuing citations for violation of City Code § 10-212. Parks received two citations on this date for allegedly violating City Code § 10-212, both of which were signed by Defendant Edwards. Defendant Sauer explained that one citation was being issued because "a placard was resting on an individual's shoes without her feet actually being inside her shoes." (Compl., ¶ 86). The officials also seized and destroyed the placards used by Cities4Life.

On July 11, 2017, Parks and Cities4Life again engaged in their activities near Preferred Women's Health. Officials from the DCE arrived, seized two placards that were leaning against a vehicle, and subsequently destroyed them. When a volunteer sat on a sign, the officials declined to take it, stating that because it was no longer being "displayed," there was no violation of any ordinance. (Compl., ¶ 91).

Similar seizures and destruction of placards belonging to individuals associated with Cities4Life occurred on August 8, 2017, and August 18, 2017. And on September 16, 2017, both pro-life and pro-choice groups marched in the vicinity of Preferred Women's Health carrying flyers and signs. City officials arrived and issued citations to individuals affiliated with the pro-life protesters, but not to pro-choice protesters.

On November 5, 2017, Parks was issued two additional citations by members of the DCE, including Defendant Krise, while displaying signs on public property in the vicinity of Preferred Women's Health.

Additionally, in the summer of 2017, Courtney spent time "peacefully praying, preaching, and further exercising his First Amendment rights on public property" near Preferred Women's Health. He brought a sign with him, and he held it upright with his hands while the bottom of the sign rested on the ground. Three officials from the DCE arrived and approached Courtney. Courtney then put his sign on the ground and sat on it "to protect his property from the city officials." (Compl., ¶ 110). The DCE members demanded that he turn over his sign, and he refused to do so. The officials then left. Courtney alleges that this "threat to take his property" has made him "fear he will lose his ability to exercise his First Amendment rights and that the city will confiscate his property." (Compl., ¶ 115).

As a result, Plaintiffs brought this action claiming Defendants violated the Plaintiffs' First Amendment rights. Plaintiffs currently have a Motion for Preliminary Injunction filed in this case to prevent the enforcement of § 10-141 pending trial. In opposition to that motion, Defendants submitted, *inter alia*, two affidavits from two purported expert witnesses. The first is the affidavit of Angela Berry, an engineer by trade who works as a Traffic Safety and ITS Program Manager for the City of Charlotte. (Doc. No. 20-7). The second is an affidavit of Sgt. Jessee Wood, who works as a Sergeant for the Charlotte Police Department. (Doc. No. 20-8). Each affidavit relies upon the training and experience of the individuals to offer opinions as to the effect on safety of the exceptions to § 10-141. Plaintiffs moved to exclude these affidavits arguing that the affiants did not meet the requirements to be an expert witness in this case. As such, the Plaintiffs moved to strike these affidavits from consideration at the preliminary injunction hearing.

## II. DISCUSSION

a. **Applicable Rules of Evidence and Standard of Review**

Rule 702 of the Federal Rules of Evidence permits admission of "scientific, technical or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," "is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." *See* Fed. R. Evid. 702. The United States Supreme Court also provided several factors to be considered by courts in evaluating expert testimony in *Daubert*. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). These factors include: whether the theory can be tested, whether the theory has been subjected to peer review, whether the theory is generally accepted in the relevant scientific community, and whether there is a known error rate for the theory. *Id.* at 589, 593-94.

It is the job of this Court to serve as a gatekeeper for expert testimony. *Id.* at 594. However, the standards by which the Court examines evidence are relaxed at the preliminary injunction stage. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3rd Cir. 2004) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)); *Lockhart v. Home-Grown Industrs. Of Georgia Inc.*, No. 3:07-CV-297, 2007 WL 2688551 at *4 n. 7 (W.D.N.C. Sept. 10, 2007) (unpublished) ("At the preliminary injunction stage, however, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence[.]"). Some courts have even held that the Federal Rules of Evidence are completely inapplicable to a preliminary injunction hearing. *See, e.g., Heideman v. South Salt*

*Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings."). Finally, some courts have admitted all expert testimony at the preliminary injunction stage and utilized the *Daubert* standard to evaluate the appropriate weight to give the testimony. *Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, No. 05-CV-329-GKF-SAJ, 2008 WL 4453098, at *4 (N.D. Okla. Sept. 29, 2008); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, No. CIV. 00-1647 JP/RLP, 2002 WL 34365244, at *2-3 (D.N.M. Sept. 30, 2002) (addressing *Daubert* challenges after admitting all expert evidence in preliminary injunction evidentiary hearing).

**b.     Berry and Wood Affidavits**

Defendants submitted the Berry and Wood Affidavits as evidence in opposition to the pending Motion for Preliminary Injunction. As such, the Court will evaluate these affidavits under the relaxed standard utilized at this procedural posture.

Regardless of whether the Federal Rules of Evidence apply in a relaxed sense or whether the Rules of Evidence do not apply at all, the Court will consider both affidavits at the preliminary injunction hearing. The Fourth Circuit has never spoken on the issue of whether the Rules of Evidence apply during preliminary injunction hearings. However, the United States Supreme Court made clear in *Camenisch* that the standard of review for a preliminary injunction is different from the standard utilized at trial or summary judgment. *Camenisch*, 451 U.S. at 395. Therefore, rather than making a final determination under Rule 702 and *Daubert* of whether Wood and Berry qualify as experts for purposes of this trial, the Court will make a less formal review of the affidavits to see if they present the indicia of reliability common to expert testimony. *See id.* ("A party thus is not required to prove his case in full at a preliminary-injunction hearing.").

7

The Court finds that, for purposes of the preliminary injunction hearing, the affidavits contain the indicia of reliability sought under Rule 702 and *Daubert*. Both affidavits offer analysis of the exceptions to § 10-141 and how those exceptions effect the public safety at large. Each affiant relies upon their professional experience or education when providing the analysis of the exceptions. The Court finds that this reliance upon experience and training provides sufficient indicia of reliability to be considered at the preliminary injunction hearing. The Court further finds that the *Daubert* arguments made in Plaintiffs' Reply are more instructive on the weight of the evidence rather than its admissibility at this procedural posture. *See Tyson Foods, Inc.*, 2008 WL 4453098, at *4.

### III. CONCLUSION

For the reasons stated above, Plaintiffs' Motion in Limine and Motion to Strike are **DENIED**.

Signed: September 27, 2018

Graham C. Mullen
United States District Judge